IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CYNTHIA A. SAUNDERS,     )
    )
    v.     )      EDGAR/CARTER
    )
JO ANNE B. BARNHARDT,     )      Case No: 1:04-CV-300
    Commissioner of Social Security     )

REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and

Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382.

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the

disposition of the plaintiff's Motion for Judgment on the Pleadings to Reverse the

Commissioner's Decision (Court File No. 13) and defendant's Motion for Summary Judgment

(Court File No. 15).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

REVERSED and the case REMANDED FOR AN AWARD OF BENEFITS.

Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 38 years old at the date of the ALJ's February 13, 2004, decision (Tr. 88).

She has a high school education plus one and one-half years of college (Tr. 52). She has

vocationally relevant past work experience as a cosmetologist (light exertion; skilled) (Tr. 88).

1

The plaintiff alleges she became disabled due to pain, fatigue, and depression secondary to fibromyalgia (Tr. 71-72, 132, 179).

<u>Administrative Proceedings</u>

The plaintiff filed applications for a period of Disability, Disability Insurance benefits, and Supplemental Security Income benefits on April 26, 2002, seeking benefits as of December 31, 1999. The claim was denied initially and on reconsideration, and a request for hearing was filed on January 27, 2003. The claimant appeared and testified at the hearing held on July 23, 2003, in Chattanooga, Tennessee, and was present at a supplemental hearing held on January 24, 2004, in which a vocational expert testified. The ALJ issued an unfavorable decision on February 13, 2004, and plaintiff timely requested review of that decision. On July 16, 2004, the Appeals Council denied that request for review (Tr. 10). This left the ALJ's decision as the final decision of the Commissioner. Plaintiff now seeks judicial review under 42 U.S.C. § 405(g).

<u>Standard of Review - Findings of the ALJ</u>

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Sec'y, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work

2

experience. *Richardson v. Sec'y, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984);

*Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the

Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28

L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Sec'y, Health and Human Servs.*, 803 F.2d

211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to

support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690,

691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment

for that of the Commissioner merely because substantial evidence exists in the record to support

a different conclusion. The substantial evidence standard allows considerable latitude to

administrative decision makers. It presupposes there is a zone of choice within which the

decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d

1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y,*

*Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

> 1. The claimant met the nondisability requirements for a Period of
> Disability and Disability Insurance benefits set forth in Section
> 216(I) of the Social Security Act and was insured for benefits
> through December 31, 2002.
>
> 2. The claimant has not engaged in substantial gainful activity
> since the alleged onset of disability (20 CFR §§ 404.1520(b) and
> 416.920(b)).
>
> 3. The claimant has an impairment or a combination of
> impairments considered "severe" based on the requirements in the
> Regulations 20 CFR §§ 404.1520(c) and 416.20(c).
>
> 4. These medically determinable impairments do not meet or

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her subjective limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.  The claimant has the residual functional capacity described above in the decision (20 CFR §§ 404.1567 and 416.967).

8.  The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

9.  The claimant is a younger individual (20 CFR §§ 404.1563 and 416.963).

10.  The claimant has a high school education plus college credits (CFR §§ 404.1564 and 416.964).

11.  The claimant has no transferrable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12.  Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21, as a framework for decision-making, there are a significant number of jobs in the national economy the claimant could perform.  Examples of such jobs include: assembler (2000 locally/200,000 nationally at the light level; 1000 locally/100,000 nationally at the sedentary level), and production inspector (1000 locally/100,000 nationally at the light level; 150 locally/14,000 nationally at the sedentary level).

13.  The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 30, 31).

<u>Issues Presented</u>

The plaintiff argues that the ALJ erred by disregarding treating physician Dr. Eugene

Huffstutter's medical opinion that his patient of over 8 years had an impairment that met the

required rheumatological criteria for a diagnosis of fibromyalgia[1] and that the patient's

---

[1] ***FIBROMYALGIA***

*A group of common nonarticular rheumatic disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft-tissue structures. These may be primary and generalized or concomitant with another associated or underlying condition, or localized and often related to overuse or microtrauma factors.*

*The term **myalgia** indicates muscular pain. In contrast, **myositis** is due to inflammation of muscles tissues and is an inappropriate term for fibromyalgia, when such inflammation is absent. **Fibromyalgia** indicates pain in fibrous tissues, muscles, tendons, ligaments, and other "white" connective tissues. Various combinations of these conditions may occur together as muscular rheumatism. Any of the fibromuscular tissues may be involved, but those of the occiput, low back (**lumbago**), neck (**neck pain or spasm**), shoulders, thorax (**pleurodynia**), and thighs (**aches and charley horses**) are especially affected. There is no specific histologic abnormality, and the absence of cellular inflammation justifies the preferred terminology of fibromyalgia rather than the older terms of fibrositis or fibromyositis.*

***Etiology***
*The condition occurs mainly in females, may be induced or intensified by physical or mental stress, poor sleep, trauma, exposure to dampness or cold, and occasionally by a systemic, usually rheumatic, disorder. A viral or other systemic infection (eg, Lyme disease) may precipitate the syndrome in an otherwise predisposed host. **The primary fibromyalgia syndrome (PFS)** is particularly likely to occur in healthy young women who tend to be stressed, tense, depressed, anxious, and striving, but may also occur in adolescents (particularly girls) or in older adults, often associated with unrelated minor changes of vertebral osteoarthritis. A minority of cases may be associated with significant psychogenic or psychophysiologic manifestations. Symptoms can be exacerbated by environmental or emotional stress, or by a physician who does not give proper credence to the patient's concerns and discharges the matter as "all in the head."*

***Symptoms, Signs and Diagnosis***
*Onset of stiffness and pain frequently are gradual, diffuse, and of an "achy" character in PFS. In localized form, symptoms are more often sudden and acute. The pain is aggravated by straining or overuse. Tenderness may be present, usually localized in specific small zones; ie, "tender points." There may be local tightness or muscles spasm, though active contractions typically cannot be demonstrated by electromyography. Inflammation is not characteristic and only occurs with an underlying systemic condition. **Diagnosis of PFS** is by recognition of the typical pattern of diffuse fibromyalgia and nonrheumatic symptoms (eg, poor sleep, anxiety,*

restrictions were such that she was precluded from working.  The ALJ further erred by

disregarding favorable findings by three consultative mental examinations.

Relevant Facts

<u>Medical evidence</u>

Ms. Saunders, a 39 year old female with a birth date of August 9, 1965, suffers from

various medical problems.  In terms of her physical impairments, Plaintiff suffers from what her

longstanding treating physician, Dr. Eugene Huffstutter, M.D., calls a "terrible fibromyalgia

---

*fatigue, irritable bowel symptoms) and by exclusion of significant contributory or underlying disease (eg, generalized OA, RA, polymyositis, polymyalgia rheumatica, or other connective tissue disease), and (most difficult of all) exclusion of psychogenic muscle pain and spasm. Fibromyalgia associated with such disorders (ie, concomitant or secondary fibromyalgia) manifests musculoskeletal symptoms and signs similar to PFS (except for psychogenic rheumatism), but requires differentiation from PFS to allow identification and treatment of both the underlying disorder and the fibromyalgia itself.  PFS, lime irritable bowel syndrome, is a well-defined dysfunctional entity, readily diagnosed by its characteristic manifestations and by screening tests to exclude underlying conditions.  Occult rheumatic disease and hypothyroidism in the middle-aged female should be excluded.  Screening tests are normal. Nonspecific and mild histopathologic changes may be present in the muscles, but similar changes are also found in normal control subjects.*

***Prognosis and Treatment***
*Fibromyalgia may remit spontaneously (in milder cases) with decreased stress but can become chronic or recur at frequent intervals.  Relief may be obtained from important supportive measures, such as reassurance and explanation of the benign nature of the syndrome, as well as stretching exercises, improved sleep, local applications of heat, gentle massage, and low-dose tricyclic agents at bedtime (eg, amitriptyline 10 to 25 mg) to promote deeper sleep.  Aspirin 650 mg orally q 3 to 4 h or other NSAIDs in full dosages have not been shown to be effective in clinical trials but may help individual patients.  Incapacitating areas of focal tenderness may be injected with 1% lidocaine solution, 1 or 2 mL alone or in combination with a 40-mg hydrocortisone acetate suspension (using the technique described for soft tissue injection in the treatment of chronic low back pain, above).  A tricyclic antidepressant drug should be used in the lowest effective dose and may be continued indefinitely with monitoring of side effects, if any.  If drowsiness occurs with one product, an alternative (in low dose) may be prescribed.  Functional prognosis is usually favorable with a comprehensive, supportive program, although some degree of symptoms tends to persist.  <u>The Merck Manual</u>, Sixteenth Edition, pp. 1369-1371.*

6

syndrome" (Tr. 196, 209, 214, 339), as well as from Raynaud's Syndrome, an idiopathic paroxysmal bilateral cynosis of the digits due to arterial and arteriolar contraction (Tr. 245), chronic pain syndrome (Tr. 333), myofacial pain syndrome (Tr. 333), and left sacroiliac joint dysfunction (Tr. 333). With respect to her mental impairments, Ms. Saunders has been diagnosed with severe bipolar disorder with psychotic features (Tr. 299), severe, major depressive disorder (Tr. 352), anxiety (Tr. 331), panic attacks (Tr. 333), and insomia (Tr. 333).

Dr. Eugene Huffstutter is Ms. Saunders' primary treating physician and has been treating her for more than 8 years, since August of 1996 (Tr. 285). On March 25, 2003, Dr. Huffstutter completed a physical medical opinion form which identified Ms. Saunders' specific physical limitations (Tr. 335-337). In so doing, Dr. Huffstutter rendered the following opinion: In an 8 hour workday, for 5 days a week, on a full time basis, Ms. Saunders is physically capable of sitting 4 hours out of 8 hours a day for 1 hour at one time; standing or walking 2 hours out of 8 hours a day for less than 1 hour at one time; lifting and/or carrying 1-10 pounds occasionally and 11-20 pounds infrequently; she could occasionally bend at the waist, reach above her shoulders, and stand on a hard surface, and she could infrequently use hands for fine manipulation (Tr. 335). Dr. Huffstutter further indicated that Ms. Saunders had problems with stamina and endurance which would require her to rest more than the one 30-minute break and two 15-minute breaks normally allowed by employers (Tr. 336). The doctor also opined that Ms. Saunders' subjective complaints seemed reasonable in view of his observations and diagnosis (Tr. 336). Dr. Huffstutter concluded that Ms. Saunders could not be reasonably expected to be reliable in attending an 8 hour day, 40 hour work week, in view of the degree of pain, fatigue or other limitations she experienced (Tr. 336).

Dr. Huffstutter further concluded that Ms. Saunders suffered severe pain and that her pain, medical condition or medication would cause her to have lapses in concentration or memory on a regular basis (Tr. 336). The doctor determined that Ms. Saunders had a reasonable medical need to be absent from a full time work schedule on a chronic basis – chronic meaning being more than 4 absences during any month's period attributable to any one medical condition or related conditions including absences for required medical treatment including appointments, diagnostic testing, treatment, etc (Tr. 337). Finally, Dr. Huffstutter noted that Ms. Saunders met the American Rheumatological criteria for Fibromyalgia (Tr. 337). It is undisputed that the limitations and restrictions articulated in Dr. Huffstutter's medical opinion would preclude Ms. Saunders from doing any work in the national economy.

On August 10, 2003, Dr. Tom A. Biller, Ed.D., completed a psychological evaluation of Ms. Saunders (Tr. 344-354). Under the heading "Summary and Recommendations," Dr. Biller indicated that Ms. Saunders "has a significant level of depression" (Tr. 352). He noted that her "ability to sustain concentration and be persistent with work processes would be impaired due to depression, anxiety and reported pain" (Tr. 352). He further opined that Ms. Saunders' "ability to interact with peers and supervisors in a standardized work setting would be somewhat impaired due to paranoid ideation" (Tr. 352). Dr. Biller also provided a diagnostic impression of Plaintiff, concluding that she suffered from severe, major depressive disorder, moderate panic disorder, Fibromyalgia and arthritis in the knees, wrists and back, and Raynaud's Syndrome that affects the circulation in her hands and feet, and migraine headaches (Tr. 352). Consequently, Dr. Biller assigned Ms. Saunders a Global Assessment of Functioning (GAF) Scale of 50, which is defined as serious symptoms (i.e., suicidal ideation, severe obsessional rituals) or any serious

8

impairment in social or occupational functioning (e.g., no friends, unable to keep a job) (Tr. 352).

On July 23, 2002, Dr. Victor Pestrak, Ph.D., completed a functional capacity assessment of Ms. Saunders (Tr. 306-308). Consistent with Dr. Biller's assessment, Dr. Pestrak concluded that Ms. Saunders had a markedly limited ability to interact appropriately with the general public (Tr. 307).

On June 28, 2002, Dr. Trevor Milliron, Ph.D., and Mr. Benjamin Biller, M.S., completed a psychological evaluation of Ms. Saunders (Tr. 295-301). Under the heading "Summary and Recommendations," Dr. Milliron and Mr. Biller indicated that Ms. Saunders reported "having a significant level of depression" as well as "a significant level of anxiety" (Tr. 299). They noted that Ms. Saunders reported "that she does not have the ability to sustain concentration and be persistent with work processes" and that "she does not posses the ability to interact with peers and supervisors in a standardized work setting" (Tr. 299). Dr. Milliron and Mr. Biller then noted that "[i]f awarded benefits [Ms. Saunders] would likely not be able to manage her own funds without help from family members" (Tr. 299). Dr. Milliron and Mr. Biller also provided their diagnostic impression of Ms. Saunders, concluding that she suffered from severe bipolar disorder with psychotic features and panic disorder and, like Dr. Biller, assigned her a Global Assessment of Functioning (GAF) Scale of 50, which is defined as serious symptoms or any serious impairment in social or occupational functioning (Tr. 299). Wayne Y. Kim, M.D., examined plaintiff on September 16, 2003, and diagnosed a Panic Disorder (Tr. 357). Dr. Kim opined that plaintiff had no limitations on her ability to understand, remember, and carry out simple instructions; slight limitations on her ability to make judgments on simple work-related

decisions; and moderate limitations to respond appropriately to work pressures and changes, and on her ability to interact with the public, supervisors, and co-workers (Tr. 358-59). During this evaluation plaintiff reported complete exhaustion and pain everywhere. She noted she was under the care of a rheumatologist for fibromyalgia. Consistent with her reported activities in the record, she reported the need to lie back down after getting up and the need to take rests before completing her housework. She reported sometimes doing shopping but that her parents would sometimes "pick up things for her" (Tr. 356).

As set out in more detail below, Dr. Huffstutter's medical opinion along with the consultative examinations of Dr. Tom Biller, Dr. Pestrak, and Dr. Milliron (along with Mr. Benjamin Biller) all provide in combination compelling medical evidence of Ms. Saunders' disability.

Hearing testimony

The ALJ asked the vocational expert to consider a claimant with plaintiff's vocational profile (38 years old, high school education, skilled work history with no transferable skills) who was limited to light work with no prolonged standing, and no excessive contact with the public, supervisors, and co-workers (Tr. 90). The vocational expert identified 4,150 jobs in the region that such a claimant could perform (Tr. 91).

The vocational expert further opined that, based on Dr. Biller's marked limitations on plaintiff's ability to interact with the public, supervisors, and co-workers (Tr. 354), the claimant could perform the 4,150 jobs (Tr. 97). If the claimant were limited to no contact with the public, supervisors, and co-workers, however, she would be unable to perform any jobs (Tr. 98).

10

<u>Analysis</u>

Plaintiff asserts the ALJ failed to give appropriate weight to the opinion of treating physician, Dr. Eugene Huffstutter, a specialist in Rheumatology, and failed to give appropriate consideration to the arguably favorable findings of three consultative examiners.

 <u>Plaintiff's Medical Impairment</u>

The plaintiff asserts she is disabled by pain, fatigue, and depression caused by fibromyalgia. Pain may be a sufficient disability for Social Security disability purposes. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983). However, the mere fact the plaintiff experiences pain does not establish her right to disability benefits. The existence of pain necessitates a finding of disability only if it is severe enough to preclude all substantial gainful activity. *Gaultney v. Weinberger*, 505 F.2d 943 (5th Cir. 1974).

The Sixth Circuit in *Duncan v. Sec'y of Health and Human Servs.,* 801 F.2d 847, 852-53 (6th Cir. 1986) adopted the following two-pronged analysis to determine whether a claimant suffers from disabling pain:

I.      Is there objective medical evidence of an underlying medical condition? If so,

II.     (a) Does objective medical evidence confirm the severity of the alleged pain arising from the condition, or

        (b) Is the objectively established medical condition of such a severity that it can reasonably be expected to produce the disabling pain?

In addition to the above framework, other factors to be considered when determining whether a claimant suffers from disabling pain include:

11

(i) Your daily activities;

(ii)The location, duration, frequency and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)The type, dosage, effectiveness and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15-20 minutes every hour, sleeping on a board, etc.);

(vii)Other factors concerning your functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. § 416.929(c)(3).

Fibromyalgia, or fibrositsis as it is also referred to, presents unique challenges to the ALJ and the Commissioner because there are no objective medical tests which can assess the severity of the disease or even its very existence. In order to diagnose the disease, a physician must perform tests to rule out other diseases and rely upon subjective symptoms related to the physician by the patient. See footnote 1, *supra.* The Sixth Circuit in *Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815 (6th Cir. 1988), discusses the anomalies of this disease:

> ...fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, *physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients.* The medical literature also indicates that fibrositis patients may also have psychological disorders. The

12

disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Id.* at 817 (emphasis added.)

Our task in reviewing this issue is complicated by the very nature of fibrositis. Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.

*Id.* at 818.

In *Preston*, the onset date of disability was in dispute. The plaintiff in *Preston* asserted she became disabled by fibrositis in May 1983 while the Secretary of Health and Human Services asserted the plaintiff did not become disabled until March 1986. The plaintiff's treating physician, Dr. Crabbs, opined the plaintiff was disabled prior to March 1986. The Secretary argued Dr. Crabbs could not be relied upon because there was no objective medical evidence to support Dr. Crabbs' opinion. The Sixth Circuit rejected this argument stating:

Although the opinion of a treating physician, when supported by medical evidence, is entitled to substantial weight in determining disability, *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986), the Secretary argues that such medical evidence is lacking to support Dr. Crabbs' opinion. The Secretary also cites the fairly normal clinical and test results obtained by Drs. Kramer and Bridwell which do not correlate with a disabling disease. However, the CT scans, X-rays, and minor physical abnormalities, noted by these doctors and cited by the Secretary as substantial evidence of no disability before March 26, 1986, are not highly relevant in diagnosing fibrositis or its severity. ***As noted in the medical journal articles in the record, fibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion. Thus, the standard clinical tests and observations conducted by Drs. Bridwell and Kramer to detect neurological and orthopaedic disease were of little aid or relevance in the diagnosis of Preston's disabling fibrositis, except as a means of excluding certain neurologic or orthopaedic causes of her pain.*** In other words, the findings of Drs. Bridwell and Kramer are not substantial evidence that Preston's fibrositis is not disabling.

*Id.* at 819-820 (emphasis added.)

In the instant case, the ALJ also found lacking objective medical evidence to cause the

subjective complaints and substantiate disabling impairments. Specifically, the ALJ stated:

> The claimant alleges disabling impairments, and the medical evidence shows that
> the claimant has medically-determinable impairments which, if sufficiently
> symptomatic, could produce the restrictions described. However, the record does
> not support the degree of severity the claimant alleges.
>
> The medical evidence of record establishes a history of fibromyalgia, including
> treatment from Rheumatologist Eugene Huffstutter, M.D., who reports the
> claimant's impairment meets the required rheumatological criteria for a diagnosis
> of fibromyalgia. Dr. Huffstutter's treatment notes, and those of Muhammad
> Munir, M.D., a primary physician, document complaints of diffuse aching and
> fatigue. Throughout the period at issue, clinical findings have essentially
> remained the same, including diffuse, soft tissue tender points, with no swelling
> or joint deformities, normal muscle strength in the upper and lower extremities,
> no ataxia, normal gait, no motor weakness, and negative straight leg raising tests
> for back pain. Some coolness of the fingers and cyanosis of the fingers and toes
> was noted, in October 2000; however, there is no evidence of that condition in
> later months, and in fact, no cyanosis of the extremities was documented.
>
> Due to the absence of significant objective and laboratory medical findings which
> provide confirmation of an impairment(s) that could reasonably be expected to
> cause the subjective complaints, and based on the relatively mild pathology
> documented by the clinical examinations, and considering the claimant's reported
> activities of daily living, all of which provide to me an indication as to the
> intensity, persistence and limitations caused by the subjective complaints, I find
> the claimant's subjective allegations to be unsupported by the record as a whole,
> i.e., the claimant's impairments do not satisfy both parts of the "two prong"
> symptoms analysis mandated by Social Security Ruling 96-7p.

(Tr. 26, 27).

The ALJ reviewed the medical evidence which he felt failed to establish an objective

basis to support plaintiff's alleged disabling impairments.

> The claimant alleges disabling impairments, and the record shows the claimant
> has medically determinable impairments, which could produce some degree of
> restriction. However, as no symptoms or combination of symptoms can be the
> basis for a finding of disability, I have considered the claimant's statements about
> her symptoms and have evaluated them in relation to the objective and laboratory
> medical evidence, to the clinical findings on examinations, and to the overall

14

consistency of the record and specifically to the consistency between the claimant's statements and other evidence (20 CFR §§ 404.1529 and 416.929, and *Social Security Ruling 96-4p, Social Security Ruling 96-7p*). The record, taken as a whole, supports a limitation of the claimant's residual functional capacity to light physical work activity, which includes the capacity to perform sedentary work, as defined in *Social Security Ruling 83-10*, with additional physical limitations to avoid prolonged standing or walking, more than 30 to 60 minutes at a time, or four hours total per day. The claimant also has the following non-exertional limitations, primarily as a result of her mental impairments, which include the need to avoid more than unskilled work, and excessive contact with the public, co-workers, or supervisors.

(Tr. 26). The ALJ continued and found that the record did not support the severity of the subjective allegations testified to at the hearing. In so doing he noted:

A diagnosis of fibromyalgia is well-documented, with evidence of diffuse tender points and complaints of easy fatigue, but the remainder of the claimant's physical findings were within normal limits.

The daily activities described by the claimant, in reports to the Social Security Administration and in consultative examinations, are not completely inconsistent with an ability to perform some level of sustained work activity. The claimant alleged her wide range of daily activities were performed only on "good" days, however, the evidence fails to establish any significant exacerbations of her symptoms or greater restrictions than she generally reported. I also note the claimant's mental impairment was not reported to have interfered with her concentration or persistence such that she was unable to perform her activities of daily living, including social interaction with a few friends, grocery shopping, attending medical appointments, and working out at a local fitness center and taking yoga classes.

(Tr. 26, 27).

The ALJ then discussed the reasons for his failure to accept and give controlling weight to the opinion of treating physician:

Dr. Huffstutter, a treating source, reported physical limitations to include sitting four hours per day, one hour at a time; standing and walking one hour per day, less than one hour at a time; and lifting 20 pounds infrequently and ten pounds occasionally. Basically, the treating physician suggested the claimant cannot attend full time work. Pursuant to Social Security Ruling 96-2p, controlling weight may not be given to a treating source's medical opinion unless the opinion

15

is well supported by medically acceptable clinical and laboratory diagnostic techniques. A careful examination of the entire record, including Dr. Huffstutter's treatment notes, discloses that his limitations on standing, walking, and sitting are not supported by any clinical or objective evidence whatsoever nor by the record as a whole. Findings on examinations were minimal, other than diffuse tender points and general complaints of fatigue. Muscle strength was normal, no motor weakness was reported, gait was normal, there was no ataxia, and straight leg raise testing for back pain was negative. I note the consulting examiner, Dr. Holland, made similar findings to those from Dr. Huffstutter and Dr. Munir, but he assessed no physical limitations (Exhibit 4F). It is reasonable to conclude that chronic diffuse muscle tenderness and complaints of fatigue could preclude heavy or medium work exertion. However, in light of a complete lack of physical, clinical or objective evidence which documents an impairment which would reasonably be expected to preclude all sustained work, I cannot afford controlling weight to the functional assessment by Dr. Huffstutter. Dr. Huffstutter's diagnosis of fibromyalgia is well-supported, but the specific physical limitations he suggested, based on the claimant's subjective allegations and not on medical findings, must be evaluated against the record as a whole and the credibility of the claimant.

(Tr. 27, 28).

There are at least four reasons, which, when considered in combination, lead me to conclude the ALJ's decision is not supported by substantial evidence. First, some of the ALJ's findings as to her daily activities based on her testimony during the July 23, 2003 hearing were not correct. Second, and most important, the ALJ has made the same error the Secretary made in *Preston*. He has applied criteria which have no usefulness in assessing the severity of the plaintiff's fibromyalgia in order to determine the plaintiff does not suffer from disabling pain. Third, Dr. Huffstutter's opinion is entitled to controlling weight as the treating physician. Fourth, Dr. Huffstutter's opinion is entitled to greater weight than Dr. Holland's because Dr. Huffstutter is a specialist in the field which normally treats fibromyalgia and Dr. Holland is not. I will address each issue in turn.

First, in his opinion, the ALJ stated the plaintiff testified "she exercises at a health club,

16

with weights.  She can reportedly bathe and dress herself, drive to the post office or doctor

appointments, fix meals, and do laundry" (Tr. 24).  I have read the transcript of the July 23, 2003

hearing, and the defendant did not testify she worked out at a health club.[2]  Rather, she testified

she is a member of a health club, but she has not been able to go due to her health (Tr.  73) ("I

belong to the Sports Barn but I have not been...I [sic] been off attending any fitness classes; I

have tried in the past.")  She did not testify she practiced yoga; rather, she stated,

> I have five pound weights and three-pound and after I've done my stretching
> routine, I guess it's kind of like yoga, where I sit on the floor and stretch my legs
> and my arms and get warmed up and I –after I've done that, I usually lay there for
> a little while.  And then I get my weights and one arm at a time, I do –try to
> exercise every part, try, yes, try.

(Tr. 74).  She further testified she attempts to perform this routine about four times a day for

about fifteen minutes at a time (Tr. 74-75).  She goes to the doctor with her mother (tr. 63), and

she make herself a sandwich for lunch (Tr. 65).  Her parents come by her apartment about every

two days and bring her cooked meals (tr. 68), buy groceries, wash her clothes, and take care of

her apartment (Tr. 66).  Sometimes she puts a load of clothes in the washer in her apartment (Tr.

66).  She sometimes makes plans to be with friends but cancels because she doesn't feel well (Tr.

75)  Although the ALJ used her activities of daily living as a basis to discount the opinion of the

treating physician who is a specialist in Rheumatology, I do not agree that the daily activities of

this individual are inconsistent with the findings of her treating physician, Dr. Huffstutter.

On the second issue, as discussed in *Preston*, normal range of motion in joints, the

presence or absence of objective and laboratory medical findings, normal muscle strength with

---

[2] According to the plaintiff, she used to work out every day until she became too ill.  *See*
Plaintiff's Pain Questionnaire dated June 27, 2002 (Tr. 155).

normal gait and normal muscle strength, absence of motor weakness and negative straight leg

tests have no relevance in determining the severity of one's fibromyalgia.[3] Fibromyalgia does

not affect the range of motion in joints or the absence or presence of normal muscle strength or

gait. The ALJ accepts that Dr. Huffstutter's diagnosis of fibromyalgia is well-supported, but

rejects the specific physical limitation found. While an ALJ may reject the opinion of a treating

---

[3] *See also* Merck Manual, *supra* note 1, at 5. In addition, in a pamphlet about
fibromyalgia, the National Institute of Arthritis and Musculoskeletal and Skin Diseases and the
National Institute of Health advise:

> Fibromyalgia syndrome is a common and chronic disorder characterized by
> widespread muscle pain, fatigue, and multiple tender points. The word
> *fibromyalgia* comes from the Latin term for fibrous tissue (*fibro*) and the Greek
> ones for muscle (*myo*) and pain (*algia*). Tender points are specific places on the
> body – on the neck, shoulders, back, hips, and upper and lower extremities –
> where people with fibromyalgia feel pain in response to slight pressure. Although
> fibromyalgia is often considered an arthritis related condition, it is not truly a
> form of arthritis (a disease of the joints) because it does not cause inflammation or
> damage to the joints, muscles, or other tissues. Like arthritis, however,
> fibromyalgia can cause significant pain and fatigue, and it can interfere with a
> person's ability to carry on daily activities. Also like arthritis, fibromyalgia is
> considered a rheumatic condition.

National Institute of Arthritis and Musculoskeletal and Skin Diseases and the National Institute
of Health, *Questions and Answers about Fibromyalgia*, p. 1 (2005),
http ://www.niams.nih.gov/hi/topics/fibromyalgia/ Fibromyalgia.pdf. This pamphlet continues:

> [T]here are currently no diagnostic laboratory tests for fibromyalgia; standard
> laboratory tests fail to reveal a physiologic reason for pain. Because there is no
> generally accepted, objective test for fibromyalgia, some doctors may
> unfortunately conclude a patient's pain is not real, or they may tell the patient
> there is little they can do.

> A doctor familiar with fibromyalgia, however, can make a diagnosis based on two
> criteria established by the ACR [American College of Rheumatology]: a history
> of widespread pain lasting more than 3 months and the presence of tender points.

*Id.* at 5-6.

18

physician where the opinion is not supported by sufficient medical data, *Young v. Sec'y of Health and Human Servs*, 925 F.2d 146, 151 (6th Cir. 1990), the ALJ in the instant case erred in relying on standard medical tests conducted by Dr. Holland to reject Dr. Huffstutter's assessment of the plaintiff because those standard medical tests are not valid indicators of the severity of a person's condition with fibromyalgia. Consequently, the Commissioner's decision to reject Dr. Huffstutter's assessment of the plaintiff or to reject the plaintiff's allegations of pain is not supported by substantial evidence.

Given that standard medical tests are not useful in assessing the severity of fibromyalgia, other factors must be considered to accomplish this task. The Sixth Circuit's discussion in *Preston* is instructive:

> On the other hand, over a period of time Dr. Crabbs has done all that can be medically done to diagnose Preston's fibrositis and to support his opinion of disability. He referred Preston to a neurologist, orthopaedist, rheumatologist, and a psychologist for evaluation. He also referred Preston to physical therapy and a pain clinic for treatment. He observed that Preston's complaints of pain, stiffness and fatigue were classic symptoms of fibrositis. Moreover, even before Dr. Crabbs was able to pinpoint fibrositis as the proper diagnosis, he was injecting cortisone or novocaine for relief into the parts of the body that he later learned were "focal tender points" characteristic of fibrositis patients. Given the circumstances of this case and the nature of this disease, Dr. Crabbs' systematic elimination of other diagnoses, identification of focal tender points, and observation of other classic symptoms of fibrositis satisfied the standard set forth in *Duncan, supra*, which requires objective medical evidence to confirm the severity of the pain arising from the condition or that the objectively established medical condition is of such severity that it can be reasonably expected to produce disabling pain.

*Id.* at 819; *See also* 20 C.F.R. § 46.929(c)(3)(listing factors to consider regarding the severity of alleged pain.)

The record in the instant case reveals a long standing treatment regime for severe and classic symptoms of fibromyalgia. The plaintiff was treated since August 7, 1996, for a

19

diagnosis of fibromyalgia syndrome. In an August 7, 1998 letter, Dr. Huffstutter indicates her

medication for her fibromyalgia included Ultram, Desyrel, Neurontin and Effexor (Tr. 289). As

early as August 7, 1996, Dr. Huffstutter notes plaintiff had a lot of diffuse myalgia and

arthralgia, and it was possible she had fibrositis. In 1997 he was continuing to treat her with

anti-inflammatory medicines (Tr. 279). By July of 1997 Dr. Huffstutter concluded that although

her joint problems were of undetermined etiology, his opinion was that her problems were

related to fibromyalgia syndrome. She was being treated with Nalfon and was resting better with

Desyrel. He changed her to Relafen for her joint symptoms (Tr. 278). In November of 1997 Dr.

Huffstutter reported that plaintiff tried Tylenol but that it did not help. Anti-inflammatory

medicines helped somewhat but she developed rectal bleeding. Her examination was benign

except for trigger points typical for muscle spasm (Tr. 272). In a November 1997 progress note

Dr. Huffstutter notes that plaintiff has definite fibromyalgia syndrome. There was no evidence

of peripheral synovitis and plaintiff had good range of motion in all joints. She did have diffuse

trigger points. On January 19, 1998, plaintiff presented for followup of her fibromyalgia

syndrome. She reported not taking some medication due to stomach upset. She had a lot of pain

across her neck and shoulders, described as a classic symptom for fibromyalgia syndrome (Tr.

270). On March 16, 1998, plaintiff was again followed for fibromyalgia syndrome. She

continued to have a lot of diffuse pain across her neck, shoulders, and legs, classic for fibrositis.

On examination she had diffuse trigger points classic for fibrositis with no acutely inflamed

joints. Dr. Huffstutter expressed concern about her need for so many medications (Tr. 268). On

April 13, 1998, Dr. Huffstutter again followed up her fibromyalgia. He noted diffuse aches

classic for fibromyalgia and lack of energy. She had good range of motion in all joints with no

effusions and synovitis. He again expressed concern about her level of medication (Tr. 265). On July 22, 1998, plaintiff had a followup visit related to her fibromyalgia syndrome. She had diffuse pains and had not been able to exercise in a week because of diffuse pain across her neck, shoulders, lower back and legs. Examination was normal, with good range of motion, no effusions or synovitis. She still had diffuse trigger points, classic for fibromyalgia. In a February 10, 1999 progress note, Dr. Huffstutter refers to her fibromyalgia syndrome as severe. Examination revealed diffuse trigger points, classic for fibrositis, no evidence of active synovitis, normal gait and strength. The next progress note is from June 21, 1999, but progress notes in the interim indicate eight phone calls regarding medication and, in one case, a complaint of extreme pain (Tr. 257). In the June 21, 1999 note there is an indication that plaintiff continued to have a lot of pain in different areas. Dr. Huffstutter gave plaintiff the name of psychologists to explore relaxation techniques and pain management techniques (Tr. 253). In an August 16, 1999 progress note plaintiff came in with head and neck pain. She had trigger points across her head and neck, but amazingly good range of motion in the neck. In the plan portion of the progress note Dr. Huffstutter notes a lot of fatigue and problems with her memory (Tr. 249). Again, after numerous phone calls in the interim, plaintiff returned with Raynaud's phenomenon and fibromyalgia syndrome. There was no evidence of joint swelling and muscle strength was normal, no sensory deficit and no motor weakness with negative straight leg raising. On October 10, 2000, a progress note refers to plaintiff as a lady with terrible fibromyalgia syndrome. Plaintiff was having a lot of problems with fatigue. There was no evidence of joint swelling, tenderness or deformity. Muscle strength was normal and there was coolness of her fingers and cyanosis of her fingers and toes. No motor weakness was found and she was negative for

straight leg raising. Again the diagnosis was fibromyalgia syndrome and cyanosis of the fingers – possible Raynaud's disease (Tr. 214). On May 22, 2001, a note indicates plaintiff called with extreme back pain, to the point of crying and no energy at all. On May 23, 2001, plaintiff saw Dr. Huffstutter and he again referred to her as a lady with terrible fibromyalgia syndrome (Tr. 209). On March 1, 2002, a progress note indicates plaintiff has terrible fibromyalgia syndrome. Once again she has no evidence of joint swelling, tenderness, or deformity, normal gait and muscle strength. Diffuse soft tissue tender points were noted. Dr. Huffstutter noted plaintiff appeared depressed. In summation, contrary to the ALJ's decision, Dr. Huffstutter's treatment notes present ample evidence to support the limitations he ascribed the plaintiff caused by fibromyalgia.

On the third issue, the deference due a treating physician, it is puzzling to the undersigned that the ALJ noted in the administrative hearing that after his review of the record he found that Dr. Huffstutter had "only seen this young woman four times apparently" (Tr. 78). I find that observation to be incorrect. Rather, as previously discussed, there has been a considerable number of examinations placing Dr. Huffstutter in the unique position of having a longitudinal view of plaintiff's medical condition. These factors indicate controlling weight should be placed on the opinion of this treating physician.

On the fourth issue of the weight to be given the opinion of a specialist, I note that while Dr. William Holland specializes in emergency medicine, Dr. Joseph Huffstutter specializes in rheumatology and is certified by the American Board of Internal Medicine in the field of rheumatology. *See* Tennessee Dept. of Health - Licensure Verification, http://www2.state,tn.us/health/licensure. Dr. Huffstutter is certified as an expert in the field

which treats fibromyalgia while Dr. Holland is not. A doctor's expertise in a given field of medicine is another factor to consider when determining the weight to give a physician's opinion. *See* 20 C.F.R. 404.1527 (d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") Thus Dr. Huffstutter's opinion is entitled to more deference than Dr. Holland's opinion for this reason as well.

Having concluded that the ALJ's decision is not supported by substantial evidence, I must now address the next course to take. When the ALJ's findings are not supported by substantial evidence, or are legally unsound, the reviewing court should reverse and remand the case for further administrative proceedings unless "the proof of disability is overwhelming or . . . the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health & Human Servs*., 17 F.3d 171, 176 (6th Cir. 1994). Having considered the record carefully, I conclude the evidence is overwhelming that the plaintiff is disabled by pain and fatigue caused by fibromyalgia and by serious mental conditions. Plaintiff suffers from what her longstanding treating physician and rheumatologist, Dr. Eugene Huffstutter, M.D., calls a "terrible fibromyalgia syndrome" (Tr. 196, 209, 214, 339), as well as from Raynaud's Syndrome, an idiopathic paroxysmal bilateral cynosis of the digits due to arterial and arteriolar contraction (Tr. 245). Her symptoms and signs meet all the classic symptoms and signs for this disease and her treatment course supports the degree of severity alleged. Furthermore, her treating physician is a specialist in this field unlike the one time examiner who used the wrong standards to measure the plaintiff's limitations caused by this disease.

In addition to the fibromyalgia, plaintiff suffered from what one examiner found to be a severe bipolar disorder with psychotic features and panic disorder. Plaintiff was assigned a Global Assessment of Functioning (GAF) Scale of 50. Two other consultative examiners, although they found plaintiff capable of some work activities based on her mental condition, found that plaintiff did indeed suffer from significant mental restrictions.

In considering Plaintiff's physical and mental impairments in combination, I conclude that the evidence is overwhelming that plaintiff is disabled. Even if the opinion of the treating physician, Dr. Huffstutter, were not given controlling weight, I would reach that conclusion.

Conclusion

For the reasons stated herein, and because the ALJ applied the wrong medical tests to the plaintiff's condition to determine there was no medical evidence to support Dr. Huffstutter's assessment that the plaintiff is disabled by fibromyalgia, I conclude the ALJ's decision is erroneously based on factors irrelevant to fibromyalgia. Substantial evidence does not exist to support the decision of the Commissioner. Therefore, I RECOMMEND that a judgment shall enter **REVERSING** the decision of the Commissioner and **AWARDING** the plaintiff benefits based on a finding of disability as of December 31, 1999[4].

s/William B. Mitchell Carter<br>
UNITED STATES MAGISTRATE JUDGE

---

[4]Any objections to this Report and Recommendation must be served and filed within ten (10 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).